1  MARK YABLONOVICH (SBN 186670)
      MYablonovich@initiativelegal.com
2  MARC PRIMO (SBN 216796)
      MPrimo@initiativelegal.com
3  JOSEPH CHO (SBN 198844)
      JCho@initiativelegal.com
4  GREGORY YU (SBN 230520)
      GYu@initiativelegal.com
5  INITIATIVE LEGAL GROUP LLP
   1800 Century Park East, 2nd Floor
6  Los Angeles, California 90067
   Telephone: (310) 556-5637
7  Facsimile: (310) 861-9051

8  Attorneys for Plaintiff
   CLARENCE L. SIMPSON
9  And Class Members

10

11              **UNITED STATES DISTRICT COURT**

12            **CENTRAL DISTRICT OF CALIFORNIA**

13

14  CLARENCE L. SIMPSON,                    Case No. CV07-156 VBF (CTx)
    individually and on behalf of other
15  members of the general public
    similarly situated,
16                                          **NOTICE OF MOTION AND MOTION
                                            FOR FINAL APPROVAL OF CLASS
17                Plaintiff,                ACTION SETTLEMENT**

18          v.

19  E-TRADE SECURITIES,                     Date:    June 2, 2008
    INCORPORATED; and DOES 1                Time:    10:00 a.m.
20  through 20, inclusive,                  Ctrm.:   9

21                Defendants.

22

23

24

25

26

27

28

1

## NOTICE OF MOTION

2    TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

3    PLEASE TAKE NOTICE THAT on June 2, 2008 at 10:00 a.m. in Courtroom

4  9 of the above-captioned Court, the Hon. Valerie Baker Fairbank presiding, Plaintiff

5  will move for final approval of the proposed class action settlement in this matter.

6    This Motion will be based on this Notice, the attached Memorandum of

7  Points and Authorities, the Declaration of Marc Primo, the Stipulation of Settlement

8  and Release Between Plaintiff and Defendant E*Trade Securities LLC ("Settlement

9  Agreement"), the pleadings on file in this matter, and on such further evidence and

10 argument as may be presented at the hearing.

11

12    ## STATEMENT OF RELIEF SOUGHT (L.R. 7-4)

13    Plaintiff seeks an Order: (1) finding that the proposed class action settlement

14 is fundamentally fair, adequate and reasonable, and (2) granting final approval of the

15 settlement.

16

17 DATED: May 19, 2008                    Respectfully submitted,

18

19                              By:   __/s/Joseph Cho_____

20                                    Joseph Cho
                                     Gregory Yu
21                                    Initiative Legal Group LLP
                                     Attorneys for Plaintiff Keegan Webster
22                                    and Class Members

23

24

25

26

27

28

1

MARK YABLONOVICH (SBN 186670)
    MYablonovich@initiativelegal.com
MARC PRIMO (SBN 216796)
    MPrimo@initiativelegal.com
JOSEPH CHO (SBN 198844)
    JCho@initiativelegal.com
GREGORY YU (SBN 230520)
    GYu@initiativelegal.com
INITIATIVE LEGAL GROUP LLP
1800 Century Park East, 2nd Floor
Los Angeles, California 90067
Telephone: (310) 556-5637
Facsimile: (310) 861-9051

Attorneys for Plaintiff
CLARENCE L. SIMPSON
And Class Members

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLARENCE L. SIMPSON, individually and on behalf of other members of the general public similarly situated,<br><br>              Plaintiff,<br><br>        v.<br><br>E-TRADE SECURITIES, INCORPORATED; and DOES 1 through 20, inclusive,<br><br>              Defendants. | Case No. CV07-156 VBF (CTx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date:     June 2, 2008<br>Time:    10:00 a.m.<br>Ctrm.:    9 |

# TABLE OF CONTENTS

**Page**

I.     **INTRODUCTION** ..................................................................................1

II.    **FACTUAL AND PROCEDURAL HISTORY** ....................................2

    A.    **Commencement of the Simpson Action** ...............................2

    B.    **The Discovery Process** .........................................................3

    C.    **The Mediation** ......................................................................5

    D.    **The Preliminary Approval Process** .....................................7

    E.    **The Claims Administration Process** ....................................7

III.   **THE SETTLEMENT MEETS THE STANDARDS FOR FINAL APPROVAL AS FAIR, REASONABLE, AND ADEQUATE** ..................8

    A.    **The Strength of Plaintiff's Case** ...........................................9

        1.    E*Trade Defended Against Certification ....................10

        2.    E*Trade Defended Against Liability and Damages ...................11

            a.    *The Administrative Exemption* .........................11

            b.    *Plaintiff's Causes of Action* .............................13

    B.    **The Risk, Expense, Complexity and Likely Duration of Further Litigation** ..............................................................14

    C.    **The Risk of Maintaining Class Action Status Throughout the Trial** ...............................................................................15

    D.    **The Amount Offered in Settlement** ...................................15

    E.    **The Extent of Discovery Completed and the Stage of the Proceedings** ........................................................................17

    F.    **The Experience and Views of Counsel** ..............................19

    G.    **The Reaction of the Class Members to the Proposed Settlement** ....20

    H.    **The Settlement Negotiations Were Intense and Conducted at Arm's Length** ......................................................................22

1

## <u>TABLE OF CONTENTS CONT'D.</u>

2
**Page**

3

4
**IV.    PROPOSED PAYMENTS TO CLASS ADMINISTRATOR ARE**

5
**FAIR AND REASONABLE** ...........................................................23
**V.    CONCLUSION** ..............................................................................23

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## STATE CASES

<u>7-Eleven Owners for Fair Franchising v. Southland Corp.</u>,
     85 Cal. App. 4th 1135, 1152-53 (2000) ........................................22

<u>Dunlap v. Superior Court (Bank of America)</u>,
     142 Cal. App. 4th 330 (2006)........................................................20

## FEDERAL CASES

<u>American Eagle Ins. Co. v. King Resources Co.</u>,
     556 F.2d 471 (10th Cir. 1977)......................................................22

<u>Bronkhorst v. Safeco Corp.</u>,
     529 F.2d 943 (9th Cir. 1976).........................................................8

<u>Class Plaintiffs v. Seattle</u>,
     955 F.2d 1268 (9th Cir. 1992)....................................................8, 9

<u>Hanlon v. Chrysler Corp.</u>,
     150 F.3d 1011 (9th Cir. 1998)....................................................8, 9

<u>Officers for Justice v. Civil Service Com.</u>,
     866 F.2d 615 (9th Cir. 1982).........................................................9

<u>Reynolds v. National Football League</u>,
     584 F.2d 280 (8th Cir. 1978)......................................................22

<u>West v. Circle K Stores, Inc.</u>,
     2006 U.S. Dist. LEXIS 76558, *17-18 (E.D. C.A. 2006)..............20

<u>White v. Starbucks</u>,
     497 F. Supp. 2d 1080 (N.D. Cal. 2007) ......................................13

# TABLE OF AUTHORITIES CONT'D.

**Page(s)**

## STATUTES

8 C.C.R. § 11040 ..................................................................................................2

29 C.F.R. § 541.205(c)(5) ......................................................................................9

29 C.F.R. § 541.203(b) ..........................................................................................9

29 U.S.C. § 207 .....................................................................................................2

Bus. & Prof. Code §§ 17200 .................................................................................2

Cal. Lab. Code §§ 201 and 202 ..................................................................... 2, 13

Cal. Lab. Code § 203 ...........................................................................................13

Cal. Lab. Code § 226(a) .......................................................................... 2, 5, 13, 19

Cal. Lab. Code § 226.7(a) .....................................................................................2

Cal. Lab. Code §§ 221, 400-410, 2802 .................................................................2

Cal. Lab. Code § 432 ..................................................................................... 5, 19

Cal. Lab. Code §§ 510 and 1194 ...........................................................................2

Cal. Lab. Code § 2699 (Private Attorneys General Act or "PAGA") ......................20

Fed. R. Civ. P. 23 ..................................................................................................1

Fed. R. Civ. P. 23(e)(2) .........................................................................................8

Fed. R. Civ. P. 26(d) ..................................................................................... 3, 17

## MISCELLANEOUS

Local Rule 37-1 ............................................................................................. 4, 18

Newberg and Conte, NEWBERG ON CLASS ACTIONS (4th Ed. 2002), § 11:41 ....... 8, 14

Newberg and Conte, NEWBERG ON CLASS ACTIONS (4th Ed. 2002), § 11:44 .............9

Newberg and Conte, NEWBERG ON CLASS ACTIONS (4th Ed. 2002), § 11:50 ...........14

Newberg and Conte, NEWBERG ON CLASS ACTIONS (4th Ed. 2002), § 11:51 ...........22

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION.

Named Plaintiff and Class Representative Clarence L. Simpson (hereinafter "Plaintiff," "Named Plaintiff," or "Class Representative") and Defendant E*Trade Securities, Inc. (hereinafter "Defendant" or "E*Trade") (collectively, the "Parties") have entered into a Stipulation of Settlement and Release Between Plaintiff and Defendant E*Trade Securities LLC ("Settlement Agreement").  Under the terms of the Settlement Agreement, which satisfy all the criteria for final approval under Fed. R. Civ. P. 23, Defendant has stipulated to conditional class certification and agreed to pay up to $900,000.00 to settle the claims of 107 Class Members.

On January 7, 2008, this Court preliminarily approved the Settlement Agreement, including class certification for purposes of the Settlement.  In addition, the January 7, 2008 Order directed distribution of the Notice of Pendency of Class Action, Claim Form, and Request for Exclusion from Class Action Settlement (collectively, "Notice").  This motion, unopposed by Defendant, seeks final approval of the Settlement.

Following entry of the preliminary approval order, each step necessary to effectuate the Settlement Agreement happened as the Court ordered.  The Notice was mailed to Class Members, who could choose whether to participate in the Settlement, opt-out of, or object to, the Settlement.  The Class Members' responses have been overwhelmingly positive.  Class Members have claimed approximately 83.53% of the Net Fund Value ("NFV").[1]  Furthermore, only one person opted out. Thus, in concert with more than 80% of the NFV having been claimed, the

---

[1]      "Net Fund Value" and all other capitalized terms specific to this Settlement are used according to their definitions in the Settlement Agreement, attached as Exh. A to the Declaration of Marc Primo in Support of Motion for Final Approval of Class Action Settlement, dated May 19, 2008 ("Primo Decl."), filed concurrently herewith.

1

minuscule opt-out rate – 0.09%, or less than one percent – imply Class Members'
resounding approval of the Settlement.  Consistent with this, not a single Class
Member has objected to the Settlement.

Accordingly, Plaintiff now moves for final approval of the Settlement.  In
evaluating the Settlement's overall fairness, a court must weigh certain factors,
which, as set forth in this brief, all favor final approval.  Plaintiff's unopposed
Motion for Final Approval should, therefore, be granted.

## II.     FACTUAL AND PROCEDURAL HISTORY.

### A.     Commencement of the Simpson Action.

On November 21, 2006, Initiative Legal Group, LLP ("Class Counsel") filed
a putative class action in Los Angeles Superior Court on behalf of Named Plaintiff
Clarence Simpson (the "Simpson Action").[2]  The original Complaint was based
upon substantial pre-filing research, both factual and legal.  After this investigation,
Class Counsel concluded that a class action should be filed to challenge Defendant's
classification of its securities brokers and broker trainees as exempt employees;
Defendant's apparent failure to provide its securities brokers and broker trainees
with overtime pay in violation of the Fair Labor Standards Act ("FLSA") and the
California Labor Code as a result of the alleged misclassification; the adequacy of
Defendant's wage statements; and Defendant's meal and rest break policies and
practices.[3]

[2]      Los Angeles Superior Court Case No. BC362354.  See Primo Decl., ¶ 10.
[3]      The Complaint alleged the following causes of action against Defendant: (1)
Violation of 29 U.S.C. § 207; (2) Violation of Cal. Lab. Code §§ 510 and 1194; (3)
Violation of Cal. Lab. Code § 226(a); (4) Violation of Cal. Lab. Code § 226.7(a); (5)
Violation of Cal. Lab. Code §§ 221, 400-410, 2802 and 8 C.C.R. § 11040; (6)
Violation of Cal. Lab. Code §§ 201 and 202; and (7) Violation of Bus. & Prof. Code
§§ 17200, et seq.  See id. at ¶ 11.
Lengthy consultations with the Named Plaintiff and Class Representative, Mr.
Clarence L. Simpson, and other witnesses triggered more detailed investigations of

2

1     Defendant answered Plaintiff's Complaint on January 4, 2007, and on April

2 16, 2007 timely removed this matter to federal court.[4]  After an initial assignment to

3 Hon. A. Howard Matz, the matter was subsequently transferred to this Court.

4

5     **B.**     **The Discovery Process.**

6     Immediately following the lifting of the discovery stay imposed by <u>Fed. R.</u>

7 <u>Civ. P.</u> 26(d), the Parties exchanged Initial Disclosures and Plaintiff served

8 certification-related discovery, including one set of interrogatories and seven sets of

9 requests for production.[5]  Additionally, the Named Plaintiff submitted to a day-long

10 deposition on May 3, 2007.[6]

11     To facilitate discovery and avert anticipated discovery disputes, the Parties

12 filed a Stipulated Protective Order on June 20, 2007, following lengthy negotiations

13 regarding its scope.  On June 21, 2007, the Court denied the Parties' request to sign

14 the Stipulated Protective Order, advising, among other things, that confidential

15 material should be specifically defined and supported by good cause for purposes of

16 a protective order sought from the Court.  Further, the Court indicated that if the

17 Parties wished to have a broader protective order that covered matters beyond

18

19 Defendant's policies and practices in connection with wage and hour issues.  These
consultations and interviews informed Class Counsel's efforts to gather relevant

20 documents, which further informed Class Counsel of the potential legal issues that
required additional research.  Class Counsel's detailed investigation and

21 examination of the evidence created a picture of the conditions under which Mr.
Simpson and his fellow employees worked.  <u>See</u> Primo Decl. at ¶ 9.

22 [4]     C.D. Cal. (Western Div.), Case No. CV 07-00156.  <u>See</u> <u>id.</u> at ¶ 10.

23 [5]     The special interrogatories requested the names and contact information of

24 putative class members.  The seven sets of requests for production were divided into
the following, three categories: (1) documents pertaining to Plaintiff's claims and

25 Defendant's defenses; (2) documents pertaining to Defendant's employment policies,
practices, and procedures; and (3) Documents pertaining to putative Class Members'

26 hours, wages, business-related expenses, repayment of wages to employer,
termination wages, meal breaks and rest breaks.  <u>See</u> <u>id.</u> at ¶ 12.

27 [6]     <u>See</u> <u>id.</u>

28

discovery, or that survived the discovery stage of the litigation, they would have to submit a request for a proposed stipulated protective order to the district judge, and clearly state in the caption that the request did not relate to a discovery dispute. Consistent with the Court's June 21 Order, therefore, and following further negotiations, the Parties filed a Request for Stipulated Protective Order Re Confidentiality Agreement (Unrelated to a Discovery Dispute) on August 17, 2007, which was signed by the Court.[7]

On July 20, 2007, Plaintiff served Defendant with a letter requesting a pre-filing conference of counsel, pursuant to Local Rule 37-1, in connection with Defendant's allegedly inadequate responses to Plaintiff's interrogatories requesting the names and contact information of the Class Members.  As of July 30, 2007, however, Defendant had not responded to Plaintiff's request for a conference of counsel.  Accordingly, Plaintiff served Defendant with a subsequent letter on July 31, 2007, advising Defendant that Plaintiff intended to file a Motion to Compel Responses to Plaintiff's Special Interrogatories, Set One, on August 6, 2007, and alleging that Defendant's failure to meet and confer in a timely manner excused Plaintiff from filing a joint stipulation in accordance with Local Rule 37-1.[8]

On August 6, 2007, Plaintiff filed a Motion to Compel Responses to Plaintiff's Special Interrogatories, Set One.  On August 7, 2007, the Court denied Plaintiff's Motion to Compel, ordering the Parties to meet and confer within five court days of the Order, and the Parties did subsequently meet and confer.[9]

After lengthy negotiations spurred by Plaintiff's Motion to Compel, as well as other discovery efforts, the Parties ultimately agreed to mediate the Simpson Action on September 25, 2007, before mediator Jeffrey Krivis.  On August 16, 2007, the Parties filed a Stipulation and Proposed Order Regarding Putative Class Member

---

[7]  See Primo Decl. at ¶ 13.
[8]  See id. at ¶ 14.
[9]  See id.

Names and Contact Information, setting forth an agreement intended to resolve the conflict around Plaintiff's discovery seeking Class Members' names and contact information.  In that August 16 Stipulation, the Parties also advised the Court that they had agreed to mediate with Mr. Krivis on September 25, 2007, and that Defendant would, within three days of the Court's entry of the stipulation as an Order, produce the names and contact information of a randomly-selected one-third of Class Members who were former employees.  The Parties further agreed that if they did not settle at the mediation, Defendant would provide the names and contact information of the remaining two-thirds of the former employee Class Members within 10 days of the mediation's conclusion.  The Court entered the stipulation as an Order on August 17, 2007, and Defendant produced the list of Class Members, in accordance with the Court's Order.[10]

Upon receiving the list of Class Members and their contact information, Class Counsel immediately began calling and interviewing Class Members.  Class Counsel obtained numerous Class Members' permission to receive their personnel files and other employment records, as well as agreements to testify.  Class Counsel requested these employment records from Defendant pursuant to Cal. Lab. Code §§ 226(a) and 432, and, during the latter portion of the summer, analyzed them in preparation for the upcoming mediation.[11]

### C.    The Mediation.

Before the September 25, 2007 mediation, Class Counsel also requested production of merits-related documents and information to permit a thorough and accurate evaluation of the case and, thereby, to engage in productive settlement negotiations at the mediation.  Defendant produced the requested information,

---

[10]    See Primo Decl. at ¶ 14.
[11]    See id. at ¶ 15.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

subject to the mediation privilege, enabling Class Counsel to determine Defendant's maximum exposure and make settlement assessments in light of that uppermost damages benchmark.  In preparation for the mediation, Class Counsel also built upon its pre-filing research and  analyzed thousands of documents, including compensation records, time records, personnel files, complaint records, purchase records, employee handbooks, training manuals, incentive plans, payroll policies and procedures, record-keeping policies and procedures, and other pertinent statistical data.[12]

Class Counsel drafted a comprehensive mediation brief, which emphasized both the procedural issues associated with class certification and the substantive issues regarding liability and damages.  The Parties exchanged mediation briefs prior to the mediation.[13]

In light of Class Counsel's substantial discovery and investigations, Plaintiff and Class Counsel were able to enter settlement negotiations having made a thorough assessment of class-wide damages.  After a full day of arm's-length negotiations at the mediation, the Parties agreed to a settlement worth up to $900,000.00 to the Class Members.[14]  At the end of the mediation, the settlement terms were memorialized in a Memorandum of Agreement. [15]  Then, for the next several months, the Parties continued to negotiate and draft the final terms and conditions for the long-form Settlement Agreement, and exchange drafts of the Notice of Pendency of Class Action, Claim Form, and Exclusion Form.[16]

---

[12]    See Primo Decl. at ¶¶ 33 & 35.

[13]    See id. at ¶ 36.

[14]    The Class is defined as, "All Relationship Managers, including, without limitation, Relationship Managers, Corporate Relationship Managers, and Active Trader Relationship Managers who worked as exempt employees for Defendant in the State of California at any time from November 16, 2002 through the date of preliminary approval of the settlement."  See id. at ¶¶ 8, Ex. A & 37.

[15]    See id. at ¶ 37.

[16]    See id. at ¶ 38.

1

### D.     The Preliminary Approval Process.

The Motion for Preliminary Approval was filed on December 13, 2007. The Parties appeared in Courtroom 9 before Hon. Valerie Baker Fairbank on January 7, 2008 for a hearing on that motion, and the Court granted preliminary approval. However, the Court ordered the Parties to submit a revised Notice of Pendency of Class Action to reflect that Plaintiff's counsel would make an application for claims administration costs, class representative enhancement award, and attorneys' fees at the time of the Final Approval hearing, and that the class representative enhancement award was sought in addition to the amount that Plaintiff will receive as a member of the conditionally certified class. On January 11, 2008, Plaintiff lodged a revised Notice of Pendency of Class Action in accordance with the Court's Order.[17]

Because Plaintiff's Motion for Preliminary Approval requested May 26, 2008, a Court holiday, as the date of the Final Approval Hearing, the Parties submitted, on February 11, 2008, a stipulation and proposed order to continue the Final Approval Hearing date and the dates governing the administration of the claims. On February 11, 2008, the Court granted the stipulation.[18]

### E.     The Claims Administration Process.

In accordance with the Order Granting Preliminary Approval, Defendant provided a list of Class Members to the designated Claims Administrator, CPT Group, Inc., on January 18, 2008. On February 19, 2008, the Claims Administrator mailed Notices to the 107 Class Members on the list.[19] In response, the Class Members have claimed 7,368 work weeks, which is equivalent to 83.53% of the total, available work weeks. Of the 107 Class Members 87 – 81.31% – submitted

---

[17]   See Primo Decl. at ¶ 44.
[18]   See id. at ¶ 45.
[19]   See id. at ¶ 46.

valid Claim Forms.  Only one Exclusion Form was submitted, and there has not been a single objection to the Settlement.[20]

## III.   THE SETTLEMENT MEETS THE STANDARDS FOR FINAL APPROVAL AS FAIR, REASONABLE, AND ADEQUATE.

There is a "strong judicial policy that favors settlements" and an "overriding public interest in settling and quieting litigation" particularly where class action litigation is concerned.  Class Plaintiffs v. Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992) (reversal of settlement approval only upon clear showing of abuse of discretion); Bronkhorst v. Safeco Corp., 529 F.2d 943, 950 (9th Cir. 1976) (public interest in containing the burdens of expensive class action litigation favors settlement).

In determining if a settlement meets the Rule 23's final approval standards, the district court must find that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  There is an initial presumption of fairness when a proposed class settlement is negotiated at arm's length and presented for court approval.  See Newberg and Conte, NEWBERG ON CLASS ACTIONS (4th Ed. 2002), § 11:41, p. 90.

This determination to approve or reject a settlement is made in the "sound discretion of the trial court."  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998).  However, in exercising its discretion, the court does not have the ability to modify or substitute any provisions or terms of the settlement; thus, "the settlement must stand or fall in its entirety."  Id.

In assessing a settlement, the district court balances the following factors: "the strength of the plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout

---

[20]    See Primo Decl. at ¶ 48 and Declaration of Becky Vanides with Respect to Notification, Proof of Claim Form Processing, and Request for Exclusion ("Vanides Decl."), ¶¶ 12, 16 & 17.

1  the trial; the amount offered in settlement; the extent of discovery completed and the

2  stage of the proceedings; the experience and views of counsel; the presence of a

3  governmental participant; and the reaction of the class members to the proposed

4  settlement." Id.  In addition, a settlement must not have been the product of

5  collusion.  Class Plaintiffs, 955 F.2d at 1290.  Here, each of these factors weighs in

6  favor of the Court granting final approval of the Settlement.

7

8          A.     The Strength of Plaintiff's Case.

9          Assessing the strength of a plaintiff's case and its likelihood of recovery

10  involves weighing the merits against the monies offered in settlement and the

11  potential recovery.  See Newberg and Conte, NEWBERG ON CLASS ACTIONS (4th Ed.

12  2002), § 11:44, 121-122.  It is not necessary, however, for the Court to "reach any

13  ultimate conclusions on the contested issues of fact and law which underlie the

14  merits of the dispute, for it is the very uncertainty of outcome in the litigation and

15  avoidance of wasteful and expensive litigation that induce consensual settlements."

16  Class Plaintiffs, 955 F.2d at 1291, citing Officers for Justice v. Civil Service Com.,

17  866 F.2d 615, 625 (9th Cir. 1982).

18          Only very recently have lawsuits been filed to challenge the exempt status of

19  stockbrokers and financial advisors under California and federal law.  This case

20  therefore involved untested legal theories and numerous unsettled questions of law.

21          There is not a single reported case holding that financial advisors are entitled

22  to overtime under California or federal law.  To the contrary: The regulations issued

23  by the U.S. Secretary of Labor, at least on their face, appear to support Defendant's

24  argument that financial advisors are exempt.  See 29 C.F.R. § 541.205(c)(5) (old

25  regs.) (listing "customers' brokers in stock exchange firms" as an example of

26  employees who perform exempt administrative work under the FLSA); 29 C.F.R. §

27  541.203(b) (new regs.) (holding that "[e]mployees in the financial services industry

28

1   generally meet the duties requirement for the administrative exemption" if their

2   duties include work such as advising customers on the advantages and

3   disadvantages of different financial products).  Further, on November 27, 2006, the

4   U.S. Department of Labor issued an opinion letter siding with the employers in the

5   financial services industry on the exempt status of financial advisors.

6           In light of these authorities, therefore, it was imperative that Class Counsel

7   persuade Defendant that it did in fact have considerable exposure.  To do so, Class

8   Counsel developed evidence to the effect that E*Trade's Relationship Managers'

9   "primary duty" was not to "advise" customers.  Rather, Class Counsel urged that

10  E*Trade's Relationship Managers primary job function was to sell financial

11  products.

12          These legal uncertainties are, of course, in addition to the risks common to all

13  class action litigation (*i.e.*, the risk of losing class certification and, even if the class

14  is certified, of losing at trial).  Here, Class Counsel was working in virtually

15  uncharted territory, against a well-funded Defendant represented by top-flight

16  counsel.

17

18              1.     E*Trade Defended Against Certification.

19          As an initial matter, E*Trade currently operates numerous branches

20  throughout California, which introduces a geographical diversity factor that could

21  adversely impact certification.[21]  Specifically, where prospective class members

22  work in geographically dispersed locations, employer-defendants frequently have

23  success arguing that the requisite "commonality" among class members – and, by

24  implication, the questions of law and fact on which the case turns – is not present.

25

26

27

28  [21]     See Primo Decl. at ¶ 18.

10

1   Second, there was the prospect that this class might have required

2   certification of smaller sub-classes, which is generally thought to adversely affect a

3   class action's manageability.[22]

4   Third, Defendant contended that individualized issues predominate over

5   common issues with respect to whether Relationship Managers exercised discretion

6   and independent judgment, one of the elements of the administrative exemption.

7   Specifically, Defendant contended that some Relationship Managers spent

8   proportionally more time on routine, relatively unimportant and non-exempt

9   activities than on properly exempt job tasks.[23]

10   Fourth, Defendant contended that there was likely considerable variance in

11   how much any particular Relationship Manager relied on his or her training and

12   sales materials, and in the degree to which a Relationship Manager developed his or

13   her own style.  Similarly, Defendant contended that Relationship Managers differed

14   in the discretion that they exercised in building and maintaining client

15   relationships.[24]

16   Fifth, Defendant contended that there is a great variance among Relationship

17   Managers as to when they take meal breaks, how often they take meal breaks, and

18   how long those meal breaks last.[25]

19

20   2.   E*Trade Defended Against Liability and Damages.

21   a.   *The Administrative Exemption.*

22   Defendant disputed the allegation that Plaintiff and Class Members were

23   misclassified as "exempt" employees, and contended that they meet the

24   _____

[22]   See Primo Decl. at ¶ 19.  The potential sub-classes were: (1) Branch

25   Relationship Managers, (2) Call Center Relationship Managers, (3) Corporate

26   Relationship Managers, and (4) Relationship Manager Trainees.  Id.

[23]   See id. at ¶ 20.

27   [24]   See id. at ¶ 21.

28   [25]   See id. at ¶ 22.

qualifications for the administrative exemption and other potential exemptions under applicable regulations and agency guidance.[26]

Specifically, Defendant contended that both the federal FLSA and California law provide that administrative employees are exempt from premium overtime requirements and the other rules at issue in this suit.  According to Defendant, the primary duty of Relationship managers (1) consists of the performance of office or nonmanual work directly related to management policies or general business operations of his employer or his employer's customers; and (2) includes the exercise of discretion and independent judgment.[27]

With respect to the first element, Defendant contended that the primary duty of Relationship Managers is not sales.  For instance, Relationship Managers manage client relationships and service walk-in clients, both of which are purportedly exempt activities.  In addition, Defendant contended that it did not pay its Relationship Managers on a commission-only basis, in contrast with the alleged practices of some other firms in the financial services industry.[28]

With respect to the second element, Defendant contended that Plaintiff's overtime claim would fail because Relationship Managers regularly exercised discretion and independent judgment on matters of significance to E*Trade, including determining clients' needs, deciding which E*Trade products and services to educate clients about, setting their own schedules, and managing client relationships.[29]

---

[26] See Primo Decl. at ¶ 24.
[27] See id. at ¶ 25.
[28] See id. at ¶ 26.
[29] See id. at ¶ 27.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

1    In addition, Defendant contended that it did not pay its Relationship

2    Managers on a commission-only basis, in contrast with the alleged practices of some

3    other firms in the financial services industry.[30]

4

5                    b.    *Plaintiff's Causes of Action.*

6        Defendant contended that Plaintiff's meal period claim would fail because

7    E*Trade consistently provided meal periods to its Relationship Managers and that it

8    was the individual employee's decision whether and when to take a meal period.  In

9    fact, on July 2, 2007, the Northern District ruled that an employer is required to

10   offer meal breaks but is not required to ensure that workers take such breaks.  See

11   White v. Starbucks, 497 F.Supp. 2d 1080 (N.D. Cal. 2007).  Defendant's position on

12   what it means to "provide" a meal break thus acquired compelling support during

13   the pendency of this case.[31]

14       Regarding Plaintiff's Cal. Lab. Code § 226(a) claim (improperly itemized

15   wage statements), there are typically no actual pecuniary damages suffered as a

16   result of an alleged violation of Cal. Lab. Code § 226(a).  The law – whether Cal.

17   Lab. Code § 226(e) requires *actual injury* - is unsettled.  Class Counsel has both

18   won and lost on this issue in other cases, in approximately equal proportions.[32]

19       Plaintiff's Cal. Lab. Code §§ 201 and 202 causes of action (payment of wages

20   upon termination or discharge) were also uncertain because statutory waiting-time

21   penalties under Cal. Lab. Code § 203 are only awarded if an employer's failure to

22   pay was "willful."  Like the meaning of "injury" in connection with wage

23   statements, the meaning of "willful" in connection with employers' failure to timely

24   provide former employees with their last paychecks is largely unsettled.[33]

25   _____

26   [30]    See Primo Decl. at ¶ 28.
     [31]    See id. at ¶ 29.
27   [32]    See id. at ¶ 30.
     [33]    See id. at ¶ 31.
28

1    Finally, Defendant contended that the Class size is small, and that the Class

2  Members generally worked few overtime hours.  Defendant accordingly contended

3  that overtime damages were de minimus.[34]

4

5    **B.    The Risk, Expense, Complexity and Likely Duration of Further**

6         **Litigation.**

7    "Additional elements that should be considered by the court in determining

8  the appropriateness of settlement are the likely expenses of continuing the litigation

9  and its prospects for relief for the class."  See Newberg and Conte, NEWBERG ON

10  CLASS ACTIONS (4th Ed. 2002), § 11:50, 155.  In most situations, unless the

11  settlement is clearly inadequate, its acceptance and approval are preferable to

12  lengthy and expensive litigation with uncertain results.  Id.

13    This case involved 107 Class Members and alleged six different causes of

14  action under California law.  One of the central disputes in this action—the

15  administrative exemption—rests on an unresolved and unsettled body of law.

16    If this case had not settled, a motion to compel further responses to Plaintiff's

17  requests for production of documents may have become necessary.  Further, a

18  motion for class certification, a possible appeal (irrespective of the certification

19  result), post-certification merits discovery, and trial preparation would have been

20  time consuming and expensive for both the Parties and the Court.[35]

21    Trial preparation for a class action trial would have consumed months, and

22  actual appearances for trial would likely have spanned weeks.  As litigation

23  progressed, complex legal analyses and extensive evidence would have accumulated

24  in volume and expense for each cause of action and corresponding affirmative

25  defense.[36]

26  _____
    [34]   See Primo Decl. at ¶ 32.
27  [35]   See id. at ¶ 43.
    [36]   See id. at ¶ 43.
28

1    Accordingly, the high risk, expense, and complex nature of a lengthy class

2 action trial support final approval of this class action settlement.

3

4    **C.    The Risk of Maintaining Class Action Status Throughout the Trial.**

5    The law favors settlement, particularly in class actions and other complex

6 cases where substantial judicial resources can be conserved by avoiding formal

7 litigation.  <u>See</u> Newberg and Conte, NEWBERG ON CLASS ACTIONS (4th Ed. 2002), §

8 11:41, 87.  The uncertainty of outcome, difficulties of proof, and length of litigation

9 of class action suits lend them readily to compromise and settlement.  <u>Id.</u> at § 11:41,

10 87-88.

11    Although Class Counsel believes that it could have obtained class

12 certification and maintained such certification throughout trial, there were

13 objectively apparent risks concerning not only obtaining class certification, but also

14 Defendant prevailing on its affirmative defenses on the merits, or succeeding on

15 appeal after still more years of uncertainty.  Moreover, if class certification was

16 granted, Defendant could later move to decertify.  On balance, therefore, Class

17 Members will benefit more from the Settlement and concomitant, immediate

18 resolution of their claims rather than risk failure at trial or summary judgment.

19

20    **D.    The Amount Offered in Settlement.**

21    On September 25, 2007, the Parties conducted an arms-length, full-day

22 mediation with Mr. Jeffrey Krivis.  Plaintiff's allegations were challenged

23 substantively and procedurally.  It is well-known among wage and hour attorneys

24 that stockbroker/financial advisor exemption cases are driven by compensation on a

25 strictly commission basis, such that the employee is not guaranteed a minimum

26 monthly salary (thereby failing the salary basis test for the administrative

27

28

1   exemption).  This feature was ostensibly absent from this class action, making the

2   litigation a very difficult proposition.[37]

3          Despite lacking the chief employer vulnerability that drives most wage and

4   hour class actions of this genre, and the array of defenses held by Defendant, Class

5   Counsel managed to obtain a favorable settlement by targeting Defendant's

6   apparently sole potential weakness, the primary duty prong of the duties test for the

7   administrative exemption.  By their skill and expertise, Class Counsel negotiated a

8   settlement that pays Class Members an amount that is in the higher end of the range

9   that similar securities broker class actions have settled.[38]

10          In the proposed settlement, Defendant has agreed to pay a settlement fund of

11   up to $900,000.00 to settle all claims.[39]  Class Counsel's attorneys' fees and costs

12   will be paid out of the settlement fund, as will the Class Representative's service

13   payment and the expenses associated with settlement and claims administration (*i.e.*,

14   notifying the class, processing responses, and distributing payments).[40]  Defendant

15   will be responsible for the employer's standard share of liability for Payroll Taxes

16   on the portions of the payments characterized as wage payments, outside the

17   settlement fund.[41]  Further, the Parties agreed to a "participation floor" of 50%,

18   which has been rendered moot because the Class Members have actually claimed

19   83.53% of the total, available work weeks compensable during the Class Period.

20   Additionally, because each Class Member's individual share is based upon the

21   length of his/her employment during the class period relative to the other Class

22   Members, the distribution is weighted in favor of those Class Members who were

23   most affected by the alleged wage and hour violations.[42]

24   
25   [37]   See Primo Decl. at ¶ 39.
     [38]   See id.
26   [39]   See id. at ¶ 40.
     [40]   See id.
27   [41]   See id.
     [42]   See id.
28

1  With the relatively small Class size involved here, it is unlikely that the small

2  monetary claims by individual Class Members would have proved viable without

3  the class action mechanism.

4  Class counsel obtained, on behalf of the Class Members, a net work month

5  value of approximately $276.47.  Compared to other, similar stockbroker class

6  actions, the settlement in the Simpson action is outstanding.  See e.g., Burns v.

7  Merrill Lynch Pierce Fenner & Smith Inc., N.D. Cal., Case No. 04-4135 (MMC)

8  ($240 net value per workmonth) and Takacs v. A.G. Edwards & Sons, Inc., S.D.

9  Cal. Case No. 04-1852 JAH ($275 net value per work month).[43]

10

11  **E.    The Extent of Discovery Completed and the Stage of the**

12  **Proceedings.**

13  Immediately following the lifting of the discovery stay imposed by Fed. R.

14  Civ. P. 26(d), the Parties exchanged Initial Disclosures and Plaintiff served

15  certification-related discovery, including one set of special interrogatories and seven

16  sets of requests for production.  The special interrogatories requested the names and

17  contact information of putative class members.  The seven sets of requests for

18  production were divided into the following, three categories: (1) documents

19  pertaining to Plaintiff's claims and Defendant's defenses; (2) documents pertaining

20  to Defendant's employment policies, practices, and procedures; and (3) Documents

21  pertaining to putative Class Members' hours, wages, business-related expenses,

22  repayment of wages to employer, termination wages, meal breaks and rest breaks.[44]

23  In an effort to avert anticipated discovery disputes, the Parties filed a

24  Stipulated Protective Order on June 20, 2007, following lengthy negotiations

25  regarding its scope.  On June 21, 2007, the Court denied the Parties request to sign

26

27  [43]   See Primo Decl. at ¶ 42.
28  [44]   See id. at ¶ 12.

the Stipulated Protective Order, advising, among other things, that confidential material should be specifically defined and supported by good cause for purposes of a protective order sought from the court, and that if the Parties wished to have a broader protective order that covered matters beyond discovery, or survived the discovery stage of the litigation, they would have to submit a request for a proposed stipulated protective order to the district judge and clearly state in the caption that the request did not relate to a discovery dispute.  Consistent with the Court's June 21 Order, and following further negotiations, the Parties filed a Request for Stipulated Protective Order Re Confidentiality Agreement (Unrelated to a Discovery Dispute) on August 17, 2007, which was signed by the Court.[45]

On July 20, 2007, Plaintiff served Defendant with a letter requesting a pre-filing of counsel, pursuant to Local Rule 37-1, in connection with Defendant's allegedly inadequate responses to Plaintiff's special interrogatories requesting the names and contact information of the Class Members.  As of July 30, 2007, however, Defendant had not responded to Plaintiff's request for a conference of counsel.  Accordingly, Plaintiff served Defendant with a subsequent letter on July 31, 2007, advising Defendant that Plaintiff intended to file a Motion to Compel Responses to Plaintiff's Special Interrogatories, Set One, on August 6, 2007, and alleging that Defendant's failure to meet and confer in a timely manner excused Plaintiff from filing a joint stipulation in accordance with Local Rule 37-1.[46]

On August 6, 2007, Plaintiff filed a Motion to Compel Responses to Plaintiff's Special Interrogatories, Set One.  On August 7, 2007, the Court denied Plaintiff's Motion to Compel, ordering the Parties to meet and confer within 5 court days of the Order.  The Parties subsequently met and conferred in accordance with the Court's Order.[47]

---

[45] See Primo Decl. at ¶ 13.
[46] See id. at ¶ 14.
[47] See id. at ¶ 14.

After lengthy negotiations, spurred by Plaintiff's Motion to Compel and other discovery efforts, the Parties ultimately agreed to mediate the Simpson Action on September 25, 2007 before Mr. Jeffrey Krivis.  On August 16, 2007, the Parties filed a Stipulation and Proposed Order Regarding Putative Class Member Names and Contact Information.  In that Stipulation, the Parties advised that they had agreed to mediate this class action lawsuit with a private mediator on September 25, 2007, and that Defendant would, within three days of the Court's approval of the stipulation, produce the names and contact information of a randomly-selected one-third of the former employees who were Class Members in the lawsuit.  The Parties further agreed that if they did not settle the lawsuit at the mediation, Defendant would provide the names and contact information of the remaining two-thirds of the former employee Class Members within 10 days of the mediation.  The Court approved the stipulation on August 17, 2007, and Defendant produced a list of names and contact information in accordance with the Court's order.[48]

Upon receiving the list of Class Members, Class Counsel immediately began calling and interviewing Class Members.  Class Counsel obtained Class Members' authority to receive personnel files and other records and agreement to testify.  These records were requested from Defendant pursuant to Cal. Lab. Code §§ 226(a) and 432 and studied.[49]

Defendant propounded written discovery and took a day-long deposition of the named plaintiff, Clarence L. Simpson.[50]

**F.     The Experience and Views of Counsel.**

"With regard to class action settlements, the opinions of counsel should be given considerable weight both because of counsel's familiarity with this litigation

---

[48]  See Primo Decl. at ¶ 14.
[49]  See id. at ¶ 15.
[50]  See id. at ¶ 12.

1   and previous experience with cases." <u>West v. Circle K Stores, Inc.</u>, 2006 U.S. Dist.
2   LEXIS 76558, *17-18 (E.D. C.A. 2006).

3        Class Counsel's primary area of practice is wage and hour class actions and
4   continues to grow in size and reputation.  Class Counsel currently employs fifteen
5   attorneys and envisions continued growth.  The attorneys working on this matter
6   have been appointed Class Counsel through both certification and settlement of
7   numerous other wage and hour class actions. [51]  Class Counsel maintains an active
8   appellate practice, allowing the firm to fully litigate any wage and hour class action
9   while preserving the continuity established at the pre-filing stage.[52]  Class Counsel's
10  experience in wage and hour class actions was integral in evaluating the strengths
11  and weaknesses of the case against Defendant and the reasonableness of the
12  settlement.[53]  It is the opinion of Class Counsel that this Settlement is fair, adequate,
13  and reasonable in protecting and vindicating the rights of Class Members.[54]

14       Defendant is represented by Seyfarth Shaw, LLP ("Seyfarth Shaw"), a large
15  and prominent law firm.  Immediately upon being served with the Complaint,
16  Seyfarth Shaw took the position that the causes of action were neither suitable for
17  class certification nor had merit.  Indeed, Seyfarth Shaw never wavered from this
18  position throughout the course of the litigation.[55]

19

20  _____

[51]      <u>See</u> Primo Decl. at ¶¶ 4 & 6.
[52]      Class Counsel persuaded the Second Appellate District to issue a writ of
mandamus overturning a trial court's misapplication of the Labor Code Private
Attorneys General Act (<u>Lab. Code</u> § 2699 et seq., or "PAGA").  <u>Dunlap v. Superior
Court (Bank of America)</u>, 142 Cal. App. 4th 330 (2006), took up whether a plaintiff
must adhere to the administrative exhaustion requirement under PAGA when
seeking penalties.  Initiative prevailed in the Court of Appeal.  As such, the decision
is likely to provide significant guidance, as it is one of the few published cases in
this relatively new body of PAGA law.  <u>See</u> <u>id.</u> at ¶ 5.
[53]      <u>See</u> <u>id.</u> at ¶¶ 4-6.
[54]      <u>See</u> <u>id.</u> at ¶ 41.
[55]      <u>See</u> <u>id.</u> at ¶ 7.

**G.     The Reaction of the Class Members to the Proposed Settlement.**

Consistent with the Court's January 7, 2008 Order granting preliminary approval, on January 18, 2008, Defendant provided Class Members' names, last known mailing addresses, and relevant employment history regarding employment status during the relevant class period to CPT Group, Inc., a well regarded third party administrator, for the distribution of the Notice.[56]  Prior to mailing the Notice, CPT Group, Inc. customized the Notices and ran a check of the Class Members' addresses against those on file with the United States Postal Service's National Change of Address ("NCOA") database to update Class Members' addresses.[57]  On February 19, 2008, CPT Group, Inc. mailed the Notices to Class Members via United States Postal Service First Class Mail.[58]

Class Members were given a 60-day notice period to submit a Claim Form, Exclusion Form, or object to the Settlement.[59]  With respect to returned Notices, CPT Group, Inc. performed a skip trace on all returned mail with no forwarding addresses to locate new addresses.[60]

Significantly, 87 of the 107 Class Members submitted valid claims, amounting to a claim percentage of 81.31%.  Furthermore, approximately 83.53% of the total number of available work weeks have been claimed.  That 81.31% of the Class claimed 83.53% of the available work weeks reflects the fact that Class Members who were most affected by the alleged wage and hour violations submitted claims at a disproportionately higher rate.  And, notably, only one individual, less than one percent (0.9%) of the total number of Class Members, opted out of the Settlement.[61]

---

[56]    See Vanides Decl. at ¶ 5.
[57]    See id. at ¶ 6.
[58]    See id. at ¶ 7.
[59]    See Primo Decl. at ¶ 47.
[60]    See Vanides Decl. at ¶ 9
[61]    See Primo Dec. at ¶ 48; see also Vanides Decl. at ¶¶ 12 & 17.

1     Certainly the most democratic measure of a settlement's "fairness" is the

2  extent to which Class Members object, and through their objections point to a

3  settlement's unfairness.  See, e.g., 7-Eleven Owners for Fair Franchising v.

4  Southland Corp., 85 Cal. App. 4th 1135, 1152-53 (2000) (only nine objectors from a

5  class of 5,454 was an "overwhelmingly positive" fact that supported approval of the

6  settlement);  Reynolds v. National Football League, 584 F.2d 280 (8th Cir. 1978)

7  (16 objectors out of 5,400 strongest evidence of no dissatisfaction with settlement

8  among class members); American Eagle Ins. Co. v. King Resources Co., 556 F.2d

9  471, 478 (10th Cir. 1977) (only one objector "of striking significance and import").

10  Here, not a single Class Member has objected to the Settlement.[62]

11     From the overwhelmingly positive response, therefore, it can be inferred that

12  the Settlement is fair, adequate and reasonable.

13

14     **H.     The Settlement Negotiations Were Intense and Conducted at**

15           **Arm's Length.**

16     Courts respect the integrity of counsel and presume the absence of fraud or

17  collusion in the negotiation of settlements, unless there is evidence to the contrary.

18  See Newberg and Conte, NEWBERG ON CLASS ACTIONS (4th Ed. 2002), § 11:51, 158.

19  Communications prior to mediation and settlement negotiations were adversarial

20  and at arm's length, requiring the assistance of an experienced mediator, Mr.

21  Krivis.[63]

22

23

24

25

26

27  [62]   See Vanides Decl. at ¶ 16.
28  [63]   See Primo Decl. at ¶¶ 33-37.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

**IV.    PROPOSED PAYMENTS TO CLASS ADMINISTRATOR ARE FAIR AND REASONABLE.**

The Settlement provides that the chosen Claims Administrator will be provided reasonable payment for its services to the Class.  Here, CPT Group, Inc. distributed Notice to Class Members in accordance with the Settlement terms, incurring costs of $10,000.00. [64]  This payment is fair and reasonable and should be given final approval.

**V.    CONCLUSION.**

For the foregoing reasons, Class Counsel respectfully requests that the Court grant final approval of the Settlement Agreement.

DATED: May 19, 2008                    Respectfully submitted,


By:  ____/s/ Joseph Cho_____
                        Marc Primo
                        Joseph Cho
                        Gregory Yu
                        Initiative Legal Group LLP
                        Attorneys for Plaintiff
                        CLARENCE L. SIMPSON

---

[64]    See Vanides Decl. at ¶ 18.